Filed 6/10/22  In re Marcus P. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MARCUS P., a Person Coming Under the Juvenile Court Law. | B313339 (Los Angeles County Super. Ct. No. 18CCJP04408) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tamara Hall, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

N.C. (Mother) challenges the jurisdiction findings and disposition order declaring six-year-old Marcus P. a dependent of the juvenile court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1), and removing him from Mother's custody. Mother contends there is insufficient evidence to support the juvenile court's findings Mother was unable to provide Marcus with care and supervision; Mother physically abused Marcus; and Mother and Mark P. (Father) engaged in physical altercations in Marcus's presence. Mother also argues substantial evidence does not support the removal order, and the juvenile court failed to state the reasons for removal or consider reasonable means to prevent removal. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

A.  *The Prior Appeal*

On June 7, 2018 a staff member from the Los Angeles County Department of Public Social Services (DPSS) called the Los Angeles County Department of Children and Family Services (Department) and alleged Mother physically abused Marcus. Marcus was "'hyperactive,'" and Mother threatened to "'whoop'"

_____

[1]  Further undesignated statutory references are to the Welfare and Institutions Code.

Marcus and told him to "'shut up'" several times. A DPSS client reported Mother "'shook the child and hit the child forcibly.'" On July 16, 2018 the Department filed a petition on behalf of Marcus pursuant to section 300, subdivisions (a) and (b)(1). On August 7, 2018, the juvenile court sustained the allegations that on June 7 Mother physically abused Marcus by forcibly shaking and striking his body. The physical abuse was excessive, causing Marcus unreasonable pain and suffering and placing him at risk of serious physical harm.

At the August 28, 2018 disposition hearing, the juvenile court declared Marcus a dependent of the court and removed him from Mother's physical custody. The court ordered Mother to attend parenting and anger management classes and individual counseling to address case issues. The court ordered Marcus to have an attention-deficit hyperactivity disorder (ADHD) assessment, individual counseling to address case issues, and conjoint counseling with Mother if recommended by his therapist. The court granted Mother monitored visits for a minimum of two times a week for two hours each visit, with the Department having discretion to liberalize visitation.

Mother appealed from the jurisdiction findings and disposition order, and we affirmed. (*In re Marcus P.* (Mar. 20, 2019, B292348) [nonpub. opn.].) On August 24, 2020 the juvenile court terminated jurisdiction and entered a juvenile custody order granting joint legal custody to Mother and Father and physical custody and primary residence to Mother. The court restricted Father's visitation to monitored visits for a minimum of two times per month because his whereabouts were unknown and he did not participate in services.

B.    *The Current Referral*

On December 24, 2020 Mother called the Department's hotline and requested six-year-old Marcus be removed immediately from her home because she did not want to end up in jail for doing something to him.  Mother reported Marcus had been detained by the Department (the prior case), and after he was returned to her care, there was "'something wrong with him,'" explaining he "'crie[d] for everything,'" was "'not listening'" to Mother, and "'kept [Mother] up all night.'"  Mother added Marcus had "'pushed [her] to [her] limits'" and she "'can't do it anymore.'"  Mother declined to provide her name or address.  In a subsequent phone interview, Mother admitted she had called the Department to request Marcus's removal.  But Mother changed her mind because Marcus had calmed down and was now well-behaved.

C.    *The Dependency Petition and Investigation*

On December 29, 2020 the Department filed a petition on behalf of Marcus under section 300, subdivision (b)(1).  The petition alleged Mother was unable and unwilling to provide Marcus with ongoing care and supervision because she requested Marcus's removal from her home on December 24.  At the January 4, 2021 detention hearing, the juvenile court released Marcus to Mother's home on condition Mother comply with wraparound services, submit to a medical "HUB" exam, and make herself and Marcus available to the Department.

In a January 28, 2021 interview with the dependency investigator, Mother stated she contacted the child abuse hotline "'to scare [Marcus] because he wasn't listening.'"  Mother said, "'Everything is okay now.  During Christmas he wasn't listening

4

to anything.  He was running around and I don't get much sleep at night because he's up all night.  I was just at my breaking point.  I'm just tired.'"

Father stated he resided with Mother and Marcus until November 3, 2020, when he left because Mother assaulted him.  Father explained, "'[S]he hit me with a Lysol can and busted my head open.'"  According to Father, Marcus was present and begged Father not to leave.  Marcus refused to talk about why Father left or whether Father and Mother fought.  Mother denied she struck Father.  She disclosed Father was on probation,[2] and she did not want him to know where she lived or to contact her or Marcus "'until he gets his life together.'"  Mother did not want Father to be involved because "'he teaches [Marcus] not to listen.'"  Father admitted he had a prior arrest for domestic violence against Mother while she was pregnant with Marcus.  But Father said the charges were dropped for lack of evidence and added, "'I never put my hands on her.'"

On February 4, 2021 the dependency investigator interviewed Marcus.  She asked Marcus whether he behaved well at home, and he responded, "'Sometimes.'"  When asked what happened when he got into trouble, Marcus replied, "'I get whooped.  My mom will whip me with a belt.'"  When questioned about where he got hit with the belt, Marcus laughed and said, "'All over my body.'"  The dependency investigator inquired as to the time frame, and Marcus responded, "'It was a long time ago like tonight.'"  Marcus did not provide a direct answer to the question whether he knew the difference between the truth and a

---

[2]     Father stated he was arrested and convicted of "receiving stolen property" and sentenced to probation.

5

lie.  When Marcus was asked whether he was fearful or scared of Mother, he laughed and said, "'No.'"  Mother denied any prior or continuing corporal punishment or physical abuse of Marcus.  She asserted the prior dependency case was based on false allegations of physical abuse.  Mother claimed when Marcus was in foster care corporal punishment was used on him and he developed negative behaviors.

D.    *Subsequent Events*

On February 10, 2021 a caller contacted the Department and alleged Mother physically abused Marcus.  In a February 17 interview, Mother denied she abused Marcus.  Mother stated if she was harming Marcus, he would be afraid of her and have marks on his body.  The social worker performed a visual body check of Marcus and did not observe marks on his body.  During the interview of Mother, Marcus threw his toys, jumped on the furniture, rolled around on the living room floor, took the social worker's cell phone, pushed Mother, and grabbed Mother's arms.  Mother told Marcus to stop, but he did not listen.  He denied Mother hit him, but he said Father hurt him.  When asked further questions, Marcus repeated, "'I can't tell you.'"

On March 8, 2021 the Department received a referral alleging Father physically abused Marcus.  The next day Mother sent the social worker text messages she had received from Father, including a profile picture of Father holding a gun and audio messages from Father saying "'you're dead bitch,'" "'I'm going to beat your mother fucking brains out,'" "'I'm going to shoot that whole mother fucking house up,'" and "'everyone in that mother fucker is dying.'"  Mother reported she and Marcus were staying with her paternal aunt, Vanessa C., because Father

knew where Mother lived.  Mother was in the process of getting a housing voucher to move out of state to protect herself from Father.  Mother requested a restraining order, and on March 17 the juvenile court issued a temporary restraining order protecting Mother and Marcus from Father.[3]

Two forensic examinations of Marcus were conducted in March 2021.  The doctor reported in the first examination that Marcus was very active and the healed scratches and marks on his body were not consistent with a belt mark.  When asked by the doctor whether his Mother told him what to say, Marcus responded, "My mom told me to say I was lying."  Marcus said he told the truth to the social worker that Mother "'worked [him] with the belt, and it hurt.'"  When asked where on his body, Marcus pointed to his arms, legs, and torso.  In a forensic examination three weeks later, Marcus initially stated his Mother punched him in the stomach when he got out of the bath, and he repeated that she hit him with a belt.  But Marcus then said Mother punched him in his old house, but not again in his new house.  He also told the social worker he had lied when he said Mother hit him with a belt.  Marcus said he could not talk about the incidents he disclosed during the interview.  The investigation into physical abuse of Marcus was closed as inconclusive.

In a March 16, 2021 interview with the dependency investigator, Vanessa reported Mother and Marcus stayed with her for two or three days in March.  Mother then stayed at a cousin's house, but she left Marcus with Vanessa.  Mother told

---

[3]     On May 12, 2021 the juvenile court granted Mother's request for a three-year restraining order to protect her and Marcus from Father.

Vanessa she was going to look at a place to live in Las Vegas, then she would return to pick up Marcus. Vanessa had seen Mother hit Marcus when he was younger, but she had not observed this happening recently. Mother let Marcus do what he wanted, and Mother did not have patience with him. Vanessa very seldom had to discipline Marcus because he listened to her. In an interview two days later, Vanessa stated, "'I do know [Marcus] loves his mom but she doesn't do right. He's told me, "I'm scared to go with my mom" but he doesn't tell me why and I don't ask. I'm always concerned when he's with her.'"

Marcus admitted to the dependency investigator he felt scared when Mother hit him, but he was "'happy now'" staying with Vanessa. Marcus stated Mother hit him "'with a belt all over [his] body,'" which he demonstrated by punching his chest, stomach, legs, and arms. Marcus added, "'I would scream and start crying.'" But then Marcus recanted, "'Actually I think she never hit me. She never hit me because I would flinch.'" When the dependency investigator inquired further, Marcus said, "'I think I lied. I think I can't remember now. I have to pretend I'm on my mom's side but I'm on both sides.'"

Marcus told the dependency investigator as to Father, "'You know he says he's going to kill us. . . . I think it's because my mom kicked him out. Wait, can you not tell my mom? Don't tell my mom what I said.'" Then Marcus said, "'[T]hey were fighting and then my dad left. Dad punched my mom in the eye and my mom hit my dad with her hand.'" When asked when it happened, Marcus replied, "'One thousand years ago I had told him not to leave but he did the opposite and he got out of here.'" Marcus added, "'I don't really know about their fights. My mom cracked my dad's head with her phone.'" Marcus denied being

scared of Mother, but he said as to Father, "'My dad is going to kill us. I'm scared to die.'" Marcus continued, "'My mom would hit my dad like she would hit me.'"

Marcus talked to another social worker about his parents' domestic violence. Father yelled he was going to shoot everyone in the house. Father then punched Mother in her right eyebrow causing bleeding; Mother punched Father back. On another occasion Marcus was in the car with his parents when Mother punched Father in the face because he did not want to spend the night at the house. Marcus repeated to this social worker that Mother "'cracked [his] dad's skull and there was blood everywhere in the bathroom!'"

Vanessa told the dependency investigator that in November 2020 Mother and Father were arguing in Vanessa's front yard and "'causing commotion.'" Marcus told Vanessa, "'My daddy is bleeding. My mom hit him in the head.'" When Mother came inside the house, Marcus told Mother, "'Don't hurt my daddy.'"

In the March 17, 2021 last minute information for the court report, the Department recommended Marcus be detained because Mother failed to participate in wraparound services and the investigations were continuing of the reports of Mother's and Father's physical abuse of Marcus. In addition, Mother had lied about her true name (Tanasha E.) and date of birth. Tanasha had a criminal history from Nevada, including a 2006 conviction for battery and a 2007 conviction for battery/domestic violence. Further, Tanasha had two other children: L.T., born in 2012, who was declared a dependent of the court and then adopted; and M.N., born in 2010, whose voluntary case was closed with M.N.

placed with her Father.[4]  The report also indicated Mother often left Marcus with Vanessa for days at a time because Mother was "unable to deal with the child's negative behaviors."  Mother told Vanessa that the pending dependency case had been transferred to Las Vegas, Nevada.  She also told the wraparound team that she planned to move to Las Vegas with Marcus on March 18.

On March 17, 2021 the juvenile court detained Marcus from Mother and Father and granted family reunification services to the parents.  The court granted Mother and Father monitored visits for a minimum of three times per week for three hours each visit.

E.      *The First Amended Petition*

On April 1, 2021 the Department filed a first amended petition adding two counts under section 300, subdivision (b)(1).  Count b-2 alleged Mother had a history of physically abusing Marcus, including hitting him on various parts of the body and on one occasion punching Marcus's stomach after his bath.  Count b-3 alleged Mother and Father had "an unresolved history of engaging in physical altercations" in Marcus's presence.  In

---

[4]      Vanessa confirmed Mother's birth name was Tanasha E.; Mother was born in 1981; and Mother had two other children before Marcus.  In December 2018 Mother legally changed her name to N.C. and successfully petitioned the court to establish her date of birth was in 1994.  Mother claimed Tanasha is her sister.  Vanessa opined Mother was "'a habitual liar.'"  Mother sent the dependency investigator a series of text messages accusing her of being a racist, but conceding Mother's different identity, explaining, "'I don't understand how I was being deceitful when I've disclosed the mistake to [you;] you're a racist . . . please seek therapy.'"

November 2020 Mother hit Father in the head with a metal can causing his head to bleed, and Father repeatedly struck Mother with his hands.

F.    *The Jurisdiction and Disposition Hearing*

At the June 3, 2021 jurisdiction and disposition hearing, Mother urged the court to dismiss the petition, arguing as to count b-1 that Mother was simply seeking assistance with Marcus, and she later changed her mind; as to count b-2, Mother denied ever touching Marcus, and Marcus later recanted as to Mother hitting him; and as to count b-3, Mother no longer had contact with Father and obtained a restraining order against him, and therefore Marcus was not at a present risk of harm.

The Department and Marcus's attorney argued the court should sustain all three counts. Marcus's attorney asserted that Marcus reported on February 4, 2021 that Mother had whipped him with a belt, which he repeated during his forensic interviews in March 2021. Although Marcus later recanted and said he had been lying, he also told the interviewer Mother told him to lie and pointed to his arms, legs, and torso as areas where he had been hit.

The juvenile court sustained the amended allegations under section 300, subdivision (b)(1). The court found as to count b-1 that Mother was unable to provide Marcus with care and supervision because she requested his removal from her home and care on December 24, 2020.

As to the physical abuse allegations in count b-2, the juvenile court stated, "[W]hen the interviewer asked the child, is there anything your mother wanted you to tell me? And the child said without hesitation, my mom told me to say that I was

11

lying. . . .  And then the interviewer asked him what did he tell the social workers?  Did he tell the social workers a lie or the truth?  He said it was the truth.  He reiterated again that initial statement that he made on February 4th, 2021, that his mother whipped him with a belt.  He was able to articulate with clarity where on his body, his arms and his legs.  It's for those reasons that the court finds [count] b-2 to be true by a preponderance of the evidence."

With respect to the domestic violence allegations in count b-3, the juvenile court stated, "Based on [M]other's statements of recent domestic violence ongoing between [M]other and [F]ather, [M]other sought a restraining order.  And [M]other was granted a restraining order based on the domestic violence inflicted [by] [F]ather towards her in May of 2021, just a couple of days ago.  And to say that there's no current risk of harm, and want to ask for this count to be dismissed, it is very much inconsistent with what was previously requested and granted.  In addition, Mother's statement—Mother's admissions regarding the ongoing domestic violence between [M]other and [F]ather, and the child Marcus's statements, the most credible statement is he stated that he does not want to die.  He's seen Mother and Father inflict domestic violence upon each other.  He's seen his mother hit his father, he indicated like she hits me, and he's seen his father hit his mother.  So it's for those reasons, but not limited thereto, the court finds this count to be true by a preponderance of the evidence and the petition is sustained."

For disposition, Mother requested a home-of-parent order because "there are reasonable means to protect the child without further removal."  Mother's attorney argued Marcus could be released to Mother with "wraparound and/or family preservation"

services with continued supervision by the Department to "ensure the child's safety." Further, Mother "object[ed] to the case plan in having to participate in parenting class, individual counseling and domestic violence support group, as she has already participated in programs in the prior case that did recently close." The Department and Marcus's attorney argued that Marcus should be removed from Mother's custody with monitored visitation.

After hearing argument from the attorneys, the juvenile court incorporated the evidence and findings from the earlier jurisdiction hearing. The court declared Marcus a dependent of the court and removed him from Mother's and Father's physical custody. The court stated, "The court finds by clear and convincing evidence pursuant to Welfare and Institutions Code [section] 361, subsection (a), that there's a substantial danger to the physical health, safety, protection and or emotional well-being of the child if the child were returned home. There are no reasonable means by which the child's physical health can be protected without removing the child from his parents' physical custody."[5] The court ordered Mother to complete an anger management course, a domestic violence support group course, and individual counseling with a licensed therapist to address

---

[5] During the hearing, Mother interrupted the proceedings multiple times with angry outbursts. Following the juvenile court's issuance of the removal order, the court removed Mother from the proceeding, explaining, "The court has warned her several times and Mother's interrupted the proceedings about seven plus times. She interrupted during minor's counsel's argument. She interrupted the court several times. And it's for those reasons that she has been removed."

13

parenting skills and case issues.  The court also ordered
wraparound services for Mother and Marcus and family
reunification services for the parents.  The court granted Mother
five monitored visits per week for a minimum of two hours each
visit.  The court ordered Father to participate in random or on
demand consecutive drug tests, a six-month drug and alcohol
program with aftercare, a 52-week domestic violence program,
parenting classes, and individual counseling with a licensed
therapist to address case issues.  The court granted Father
monitored visits for a minimum of three times per week for three
hours each visit.

Mother timely appealed.[6]

---

[6] Father does not appeal from the jurisdiction finding against
him sustaining the allegation in count b-3 that he and Mother
"engaged in physical altercations" in Marcus's presence.  "'[A]
jurisdictional finding good against one parent is good against
both.  More accurately, the minor is a dependent if the actions of
either parent bring [the minor] within one of the statutory
definitions of a dependent.'" (*In re Briana V.* (2015)
236 Cal.App.4th 297, 308; accord, *In re L.O.* (2021)
67 Cal.App.5th 227, 237.)  "However, we generally will exercise
our discretion and reach the merits of a challenge to any
jurisdictional finding when the finding (1) serves as a basis for
dispositional orders that are also challenged on appeal [citationl;
(2) could be prejudicial to the appellant or could potentially
impact the current or future dependency proceedings [citations];
or (3) 'could have other consequences for [the appellant], beyond
jurisdiction.'" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-
763; accord, *In re L.O.*, at p. 237.)  We exercise our discretion to
consider the jurisdiction finding against Mother for physical
abuse because it serves as a basis for the removal order that
Mother also challenges on appeal.

14

## DISCUSSION

A.  *Substantial Evidence Supports the Jurisdiction Finding of Physical Abuse Under Section 300, Subdivision (b)(1)*

1.  *Governing law and standard of review*

The juvenile court has jurisdiction over a child if the Department establishes by a preponderance of the evidence that an allegation made pursuant to section 300 is true.  (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.)  Section 300, subdivision (b)(1), allows the juvenile court to assume jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

"A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness."  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601 (*Cole L.*); accord, *In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re R.T.* (2017) 3 Cal.5th 622, 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)  "Although section 300 requires proof the child is

15

subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Cole L.*, at pp. 601-602; accord, *In re L.O.*, *supra*, 67 Cal.App.5th at p. 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"].)  "A parent's '[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

We review the juvenile court's jurisdiction findings for substantial evidence in light of the whole record.  (*In re I.C.* (2018) 4 Cal.5th 869, 892 ["the evidence supporting the jurisdictional findings must be considered "'in the light of the *whole record*'" 'to determine whether it discloses substantial evidence'"]; *In re R.T.*, *supra*, 3 Cal.5th at p. 633 ["'In reviewing the jurisdictional findings and disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.'"].)  Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*In re I.C.,* at p. 892; accord, *In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602.)  "'[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.*, at p. 633; accord, *In re I.J., supra*, 56 Cal.4th at p. 773; *Cole L.*, at p. 602 ["while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a

finding"].)  "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders."  (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329.)

2.     *Substantial evidence supports the juvenile court's jurisdiction findings*

Mother contends there is insufficient evidence to support the jurisdiction finding under section 300, subdivision (b)(1), that she physically abused Marcus or there was a substantial risk she might abuse him.[7]  Mother points to her denial that she ever hit Marcus with a belt, and the inconsistency of Marcus's statements.  Mother also asserts it is not "plausible" she would abuse Marcus given her fear the Department would take him away.  Further, "Marcus would have likely had bruising, marks, or some credible recollection of when the abuse occurred."

Substantial evidence supports the juvenile court's finding that Mother physically abused Marcus.  In a February 4, 2021 interview, six-year-old Marcus told the social worker, "'I get whooped.  My mom will whip me with a belt.'"  He added that Mother hit him all over his body.  Marcus recanted during his February 17 interview, but during the March 3 forensic examination Marcus stated, "'My mom told me to say I was lying.'"  And Marcus said he told the truth to the social worker that Mother "'worked [him] with the belt, and it hurt.'"  Marcus again indicated Mother hit his arms, legs, and torso.  Later in

---

[7]     Mother does not argue the juvenile court erred in assuming jurisdiction under section 300, subdivision (b)(1), rather than section 300, subdivision (a), based on Mother's physical abuse of Marcus.

17

March Marcus told the dependency investigator he felt scared when Mother hit him. He repeated that Mother hit him with a belt all over his body, demonstrating by punching his chest, stomach, legs, and arms. Marcus then recanted (saying "'she never hit me'"), but when the dependency investigator inquired further, he responded, "'I think I lied. I think I can't remember now. I have to pretend I'm on my mom's side but I'm on both sides.'"

Although the forensic examinations of Marcus did not reveal marks or bruises indicating physical abuse, the juvenile court found Marcus's account of physical abuse credible, observing Marcus "said without hesitation" that Mother told him to lie, and he said to the forensic examiners that he had told the social workers the truth. "'Evidence from a single witness, even a party, can be sufficient to support the trial court's findings.'" (*In re D.C.* (2015) 243 Cal.App.4th 41, 52]; accord, *In re S.A.* (2010) 182 Cal.App.4th 1128, 1148.) Further, Mother's credibility was questionable in light of her lying to the Department about her identity and her prior child welfare history involving her two other children. Vanessa described Mother as "'a habitual liar.'"

In addition, Marcus was at risk of future physical abuse. Marcus stated just three months before the jurisdiction hearing (in March 2021) that Mother hit him with a belt. Mother repeatedly denied she had ever hit Marcus with a belt or otherwise physically disciplined him. Mother continued to claim the prior dependency case was based on false allegations of physical abuse despite the report from a third-party observer that Mother had hit Marcus. Moreover, Vanessa stated she had seen Mother hit Marcus when he was younger, contrary to Mother's denial of ever hitting Marcus. Vanessa also reported Marcus told

her, "'I'm scared to go with my mom.'" Mother's denial of abuse made it unlikely she would change her behavior, especially given that she had difficulty controlling Marcus. (See *In re D.B.* (2020) 48 Cal.App.5th 613, 622 ["'One cannot correct a problem one fails to acknowledge.'"]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

B.  *Substantial Evidence Supports the Removal Order*
    1.  *Governing law and standard of review*
    "'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 264-265; see § 361, subd. (c)(1).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.,* (2018) 26 Cal.App.5th 320, 332; accord,

19

*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; accord, *In re V.L., supra*, 54 Cal.App.5th at p. 155 ["*O.B.* is controlling in dependency cases."].) We review the entire record to determine whether the removal order is supported by substantial evidence. (*V.L.*, at p. 155; *In re I.R., supra*, 61 Cal.App.5th at p. 520.)

2. *Substantial evidence supports the juvenile court's removal order, and any error in failing to make findings on the record was harmless*

Mother contends there is not substantial evidence to support removal of Marcus from her physical custody and there

20

were reasonable alternatives to removal. However, the same evidence that supports the jurisdiction findings provides substantial evidence to support the juvenile court's order. As discussed, there was substantial evidence Mother hit Marcus with a belt all over his body, and Marcus recanted because Mother told him to lie. Mother denied she ever hit Marcus, but she lied about her identity, the prior child welfare history involving her two other children, and her prior abuse of Marcus. Mother's denial of physical abuse placed Marcus at a substantial risk of future harm if released to Mother because she did not accept that she posed a risk to him. And there was a substantial risk Mother might abscond with Marcus if he were returned to her care because Mother told Vanessa and the wraparound team that she planned to move with Marcus to Las Vegas.

Although Mother suggests there were less drastic alternatives to removal, including unannounced visits, in light of the risk of physical violence to Marcus and Mother's denial of past abuse, those measures would not have prevented Mother from harming Marcus in the first instance. Further, Mother failed to participate in wraparound services, and despite her completion of parenting and anger management classes in the 2018 dependency proceeding, the physical abuse continued.

Mother also contends the juvenile court failed to state its reasons for removal or what protective measures the court considered in deciding Marcus could not be returned to Mother. The juvenile court incorporated its jurisdiction findings on physical abuse into its findings supporting the disposition order, but it failed to address specifically why Marcus needed to be removed and why other protective measures would be inadequate. This was error. (See § 361, subd. (e) ["The court

21

shall state the facts on which the decision to remove the minor is based."].)  The court's boilerplate findings that there was clear and convincing evidence of a substantial danger to Marcus's physical health if he were returned home and no reasonable means to protect Marcus absent removal are not a sufficient substitute for the juvenile court making factual findings on the record tailored to the case.

However, the failure of the juvenile court to state its factual findings was harmless error because given the evidence of Mother's continuing abuse of Marcus and adamant denial that the abuse had occurred, it is not reasonably probable had the court expressly made findings under section 361, subdivision (e), its findings would have been in favor of Mother's continued parental custody.  (*In re L.O., supra*, 67 Cal.App.5th at p. 247 ["'[C]ases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.'"]; *In re V.L., supra*, 54 Cal.App.5th at p. 159 ["because the last incident of domestic violence involving father was so dangerous and troubling, it is not reasonably probable that the juvenile court would have reached a different conclusion if it stated the facts it relied upon"]; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137 ["Although the court did not state a factual basis for its removal order, any error is harmless because it is not reasonably probable such findings, if made, would have been in favor of continued parental custody."], disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6; see Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . for any error as to any

matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].)

## DISPOSITION

The jurisdiction findings and disposition order are affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.